IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| NOAH WILLIAM WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO.  3:10cv780-TMH |
| | ) | (WO) |
| MIKE PARRISH, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**INTRODUCTION**

Noah White shot a police officer.  For approximately an hour White hid from officers who responded to a call for assistance.  White then stole a police vehicle, and as he fled from the scene he fired his weapon numerous times at the officers.  The officers returned fire; White lost control of the police vehicle which crashed, and he was taken into custody. Against this factual backdrop, White brings this 42 U.S.C. § 1983 action against several of the officers who shot and wounded him, claiming they violated his rights under the Fourth Amendment because they used excessive force against him.  The officers contend that they are entitled to qualified immunity, a contention with which the court agrees as will be discussed in this Recommendation.

Previously, the court ordered the defendants to file an answer and a special report, and they have done so.  After all special reports were filed, the court notified the plaintiff that the reports could at any time be considered as motions for summary judgment.  The court also

informed the plaintiff about the proper manner in which to respond to a motion for summary judgment, and set a deadline for the plaintiff's response.  The plaintiff has responded, and the court concludes that the motions for summary judgment are properly before the court for consideration.  Upon consideration of the motions, the court concludes that they are due to be granted and this case dismissed with prejudice.

## STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute][1] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation omitted); FED.R.CIV.P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence which would be admissible at trial indicating

---

[1]  Effective December 1, 2010, the language of Rule 56(a) was amended.  The word "dispute" replaced the word "issue" to "better reflect[] the focus of a summary-judgment determination." FED.R.CIV.P. 56(a), Advisory Committee Notes, 2010 Amendments.

there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-324.

Once the movant meets his evidentiary burden and demonstrates the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; FED.R.CIV.P. 56(c) ("A party asserting that a fact cannot be or is genuinely disputed must be support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.").  A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263.

To survive the movant's properly supported motion for summary judgment, a party is required to produce "sufficient [favorable] evidence" "that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "If the evidence [on which the nonmoving party relies] is merely colorable . . . or is

not significantly probative . . . summary judgment may be granted." *Id*. at 249-250.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990) *quoting Anderson*, *supra*.  Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).  Hence, when a nonmoving party fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to its case and on which the nonmovant will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party.  *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004).  What is material is determined by the substantive law applicable to the case.  *Anderson*, 477 U.S. at 248; *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that

4

factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co, Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates that there is no genuine dispute of material fact and that the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine dispute as to a requisite material fact); *Waddell*, 276 F.3d at 1279 (to establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor). However, if there is a conflict in the evidence, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1356 (11th Cir. 2000).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine

5

issue of material fact.  *Beard v. Banks*, 548 U.S. 521, 529 (2006); *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990).  Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case.

## DISCUSSION

Due to his actions as recounted briefly at the beginning of this Recommendation, White was indicted on February 13, 2009, by the Grand Jury of Chambers County for seven counts of Attempted Murder, in violation of ALA. CODE §§ 13A-4-2 and 13A-6-2(1975), and one count of Discharging a Weapon into an Occupied Dwelling, in violation of ALA. CODE § 13A-11-61(1975).  On February 18, 2009, he pled not guilty.  Trial began on February 22, 2010.  After hearing the evidence, the jury found White guilty of all charges.  On March 30, 2010, the trial court sentenced White to thirty years imprisonment on each charge of Attempted Murder and twenty years imprisonment for Discharging a Weapon into an Occupied Dwelling.  On February 18, 2011, the Alabama Court of Criminal Appeals affirmed White's conviction without issuing an opinion.  White did not file a petition for certiorari with the Alabama Supreme Court.

In this civil action, White seeks damages from the defendants pursuant to 42 U.S.C. § 1983 claiming that during his arrest on September 21, 2008, they used excessive force against him in violation of his constitutional rights.  The defendants contend that they are entitled to qualified immunity because their use of deadly force was reasonable under the circumstances.

Under the well-defined qualified immunity framework, a "public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted). There is no genuine dispute[2] that the defendant officers were acting in their discretionary capacity in this case; thus, the burden shifts to the plaintiff to show that qualified immunity is inappropriate. *Id.* To do so, the plaintiff must meet the two-part standard established by the Supreme Court in *Pearson v. Callahan*, 555 U.S. 223 (2009). First, the plaintiff must allege facts that establish that the officers violated his constitutional rights; and second, the plaintiff must also show that the right involved was "clearly established" at the time of the putative misconduct. *See id.* at 232. This inquiry is "undertaken in light of the specific context of the case, not as a broad general proposition." *Lee*, 284 F.3d at 1194. In *Pearson*, the Supreme Court concluded that a court may assess these factors in any order. 555 U.S. at 236. In this case, the plaintiff fails to establish the first prong.

White describes the alleged violations in this way:

> On the night of September 21st 2008, on Noah William White's Uncle Doug White's property located at . . . Lanett Alabama 36863, in Chambers County, several city and county law enforcement officers went outside the scope of their law enforcement duties when they used Excessive Force against White and shot at him with 9 millimeters, 40 calibers, AR15 assault rifles, and 12 gague (sic) shot guns. The officers shot a total of 269 rounds of ammunition

---

[2] White states that the defendant "officers went outside the scope of their law enforcement duties" but this conclusory claim unsupported by any facts about the scope and nature of the officers' duties is insufficient to create a genuine dispute.

at White within approximately 30 seconds as he drove a Sheriff's SUV around a road block in his Uncle's driveway and yard in hope to escape the gun fire with his life. The officers' conduct was intentional, malicious, and in bad faith.

White was hit by at least 12 of the bullets. As a result of this attack White has now had three surgeries. White had a colostomy that he lived with through his jury trial.  White's colostomy was reversed with surgery about eight weeks ago, (July 2010).  Also White's right leg was almost blown off; and he has a steel rod running through his bone from his knee to his ankle.

(Doc. # 1 at 4).

Officer Jason Dutton filed an affidavit in support of his motion for summary

judgment.  Dutton states

On September 21, 2008, I was on patrol and received a 00 call from Sergeant Matt Blackstone stating shots had been fired and an officer was down. Sergeant Blackstone stated he was at 23rd Phillips Road in Hughuley, Alabama. I responded from Highway 50.When I arrived at the scene, I exited my vehicle and heard two shots fired. I then saw Sheriff Lockhart exiting the scene in Deputy Rollins patrol unit. I ran up the hill to where I came in contact with Reserve Officer Michal Todd running down the hill. I asked Todd where Matt was at and he stated he was up behind a car. I told Todd to go back to the city with Officer Blue because he did not have a vest on. Todd stated ok and he left with Officer Blue. I then belly crawled from a fence to where Matt was behind the car. There was a Lanett Police Officer also with Matt, but I do not know that officer's name. I then asked Matt where the shooter was and he stated he was not sure but that he had shot Deputy Rollins from the side of the barn in front of us.

We three officers were now holding forward security on the barn and a mobile home below the bam. We had been behind a blue car for about an hour when the shooter started yelling from behind the barn "You better leave or you are going to get hurt".  I stated to the shooter that I could hear him.  I stated my name was Jason Dutton of the Lafayette Police Department and that I could not leave. I then started talking to the shooter trying to get him to come out and give himself up. 1 asked the shooter to put his gun down and come out with his hands up and lay down on the ground and everything would be over. 1 asked him was he hit, did he need a medic and if he would put his hands up and come out. The shooter started saying again "You better leave or you are

going to get hurt". The shooter then started stating "I know you are by yourself". Then the shooter started shooting at us from beside the barn. Now fearing for my life as well as the life of my fellow officers, I began to return shots shooting approximately two to three times. A few minutes passed after the shots were fired, then the shooter asked "Now are you o.k.?" I did not answer the shooter back because 1 felt as if he was trying to find our position. Fifteen to twenty minutes later, Sergeant Mike Parish and others came to our position.

At this time the shooter was moving up the hill like he was trying to come behind us. Then the shooter went up to the Sheriff s Department Durango and opened the door and got inside. At this time, we could see the shooter moving around inside the Durango. The shooter then started the Durango. We ordered the shooter out of the vehicle. The shooter then turned the vehicle around towards us and was driving at us at a high rate of speed trying to run over us and firing a weapon at us. I then returned fire at the shooter using 6 3/4 Glock magazines. At this time, Sergeant Mike Parish (sic) pulled me out of the way of the moving vehicle that went down the hill towards other officers. At this time the officers down the hill opened fire at the Durango coming toward them at a high rate of speed. The Durango came to rest at the bottom of the hill. At that time, Sergeant Mike Parish (sic) and I were running down the hill to the resting Durango. We stopped running until the officers at the bottom of the hill ceased fire. We then ran up to the shooter, who jumped out of the vehicle, and was laying on the ground. An officer placed the shooter in handcuffs. I am unsure as to who the officer was.

(Doc. # 37 at 1-3).

A careful review of White's submission and the defendants' affidavits show that there is no dispute about the salient facts in this case. The court, however, will address each of White's contentions concerning the motions for summary judgment.

In White's response to the defendants' motions for summary judgment, he first complains about the failure of the defendants to produce what he terms a "second video" of the incident. On December 15, 2010, the court entered an order requiring the defendants to supplement their motion for summary judgment with copies of any video recordings of the

9

incident.  The response to this order indicated that the defendants were aware of only two videos and neither was in the custody or control of any of the defendants.  Of course, pursuant to FED R. CIV. P. 34(a) a party is required to produce only those documents which are in the party's "possession, custody, or control…"  Thus, White cannot be heard to complain about the defendants' failure to produce videos which are not in their possession, custody or control.

White next argues that the affidavits of the defendants lack credibility because those affidavits are inconsistent with testimony given at White's criminal trial.  However, White admits that he does not have in his possession a transcript of his criminal trial, and he is unable to point to specific instances of contradictory testimony.  In the absence of any specific evidence about material contradictions, White's claim is insufficient to cast doubt about the credibility of the defendants' affidavits.

In a further effort to support his contention that the defendants lack credibility, White points to what he claims is a contradiction between affidavits of the defendants and a statement in the defendants' special report which the court is now construing as a motion for summary judgment.  In the defendants' special report, there is a statement that when the defendants arrived on the scene "they did know where plaintiff was located for over an hour."  Each of the affidavits of the defendants touching on this point states, however, that they did *not* know where the plaintiff was located for over an hour.  White's contention about this seeming contradiction fails to establish a genuine dispute. First, statements contained

within the defendants' special report are not evidence.  Secondly, it is apparent that the isolated statement contained within the special report is most likely a typographical error. But in any event, it is the sworn testimony of the defendants contained in their affidavits that is material to resolution of the defendants' motions for summary judgment, not the unsworn statements of the defendants' counsel.

Additionally, White points to other differences between statements of the various defendants. The court has carefully reviewed each of the affidavits filed by the defendants. Predictably, there are differences between the defendants' perceptions about the events in which they were involved.  However, none of these differences are material to the resolution of the issues in this case and certainly do not cast doubt on the credibility of the defendants.

In furtherance of his credibility arguments, White also claims that it was impossible for defendant Dutton to have used six and three-fourths Glock magazines against White.  "In order for Dutton's above said testimony to be true, he would have had to fire almost three bullets per second . . . not allotting for the time it took for Dutton to reload."  Other than his own speculation that it does not take an expert to know this, White offers no evidence which supports this contention.

Interestingly, White makes the following argument.

[I]t is not at all likely that what the defendant, Dutton, states as fact is even possible. The defendant, Dutton, testifies that "the shooter then turned the vehicle around towards us and was driving at us at a high rate of speed trying to run us over and firing a weapon at us.  I then returned fire at the shooter using 6 3/4 Glock magazines. At this time, Sergeant Mike Parrish pulled me out of the way of the moving vehicle that went down the hill towards other

11

officers. At this time the officers down the hill opened fire at the Durango coming toward them at a high rate of speed.

(Doc. # 50 at 4).

White advances this statement as proof that the defendant Parrish could not have used as many Glock magazines as he stated. However, the salient point about White's recitation is that he does not in any way raise any dispute about him driving the Durango vehicle at the officers.

In further response to Dutton's affidavit which is set out above, White correctly points out that Dutton is the only defendant to state that White was offered a way to surrender. But aside from this observation, White does not dispute that Dutton offered him a way to surrender. Rather, White says this.

> The plaintiff, Noah William White, declares that he: (1) did not hear defendant Jason Dutton or any other officer ever offer him a way to surrender on the night of the incident at issue. (2) did not try to run over defendant Dutton with a vehicle on the night of the incident at issue. (3) did not come close to running over defendant Dutton with a vehicle on the night of the incident at issue. (4) did not fire his weapon at defendant Dutton until Dutton first fired upon him.

(Doc. # 50 at 27).

The fact that White did not hear any officer offer him a way to surrender does not create a dispute about whether Dutton made the offer. Whether White attempted to run over Dutton or other officers does not create a dispute sufficient to render summary judgment improper. What White tried to do or how close he came to the officers is immaterial to whether the officers reasonably perceived their lives or the lives of others to be in danger at

12

that time or had White escaped.  There is no dispute about these facts.  White shot a police officer.  White had fired a weapon numerous times at officers.  White stole a police vehicle and was attempting to escape.

Where, as here, a plaintiff claims that a law enforcement officer has used excessive force in the course of arresting or otherwise seizing him, the court analyzes his claim under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989).  In deciding whether a police officer used excessive force, the court must pay "careful attention to the facts and circumstances" of the case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396 (citing *Tennessee v. Garner,* 471 U.S. 1, 8- 9 (1985)).

In the deadly force context, a police officer may constitutionally use deadly force when the officer

> (1) "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" or "that he has committed a crime involving the infliction or threatened infliction of serious physical harm"; (2) reasonably believes that the use of deadly force was necessary to prevent escape; *and* (3) has given some warning about the possible use of deadly force, if feasible.

*McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009).  But, these useful factors must not be applied mechanically, *see Penley v. Eslinger,* 605 F.3d 843, 849-50 (11th Cir. 2010), and the court "must still slosh  . . . [its] way through the fact bound morass of 'reasonableness,'" *Scott v. Harris,* 550 U.S. 372, 383 (2007).

Even so, consideration of the factors is helpful in determining the reasonableness of the defendants' conduct. The first factor is whether the officers had probable cause to believe that White posed a threat of serious physical harm, either to the officers or to others or whether he committed a crime involving the infliction or threatened infliction of serious physical harm. White shot a police officer; about that there is no dispute. Thus, the defendants had ample probable cause to believe White posed a threat of serious physical harm to the defendants and to others. The second factor asks whether the defendants reasonably believed that the use of deadly force was necessary to prevent escape. The undisputed facts show that when officers arrived on the scene of the shooting, they did not know where White was and were not able to locate him for approximately an hour. Then, when White finally made himself known, an officer attempted to get White to surrender. White's response was to threaten the officers with harm and shoot at them. White then stole a police vehicle and while attempting to flee, again shot at the officers. Under these circumstances, the court has no hesitancy in concluding that the officers reasonably believed that not only was the use of deadly force reasonable to prevent escape but that it was also reasonably necessary to prevent harm to the officers and others. Finally, the last factor asks whether it was feasible to give some warning about the possible use of deadly force. The first encounter officers had with White was when he was hiding in or near a barn. White's response to officer Dutton's entreaties to surrender was to fire his weapon at the officers as well as threaten them with harm. The officers' second encounter with White involved him

14

attempting to flee in a stolen vehicle which he used as a platform from which to continue shooting at the officers.  Under these circumstances – a rebuffed surrender request and an armed fleeing felon who had already shot one officer and who continued to shoot at others – no further warning was reasonably feasible or necessary.[3]

Under the circumstances of this case, the court concludes that the defendants' use of deadly force was objectively reasonable in light of the severity of White's criminal behavior, the fact that he posed an immediate, serious threat to the officers and other caused by his reckless actions, and the fact that he was actively fleeing from arrest by his own use of deadly force.  In short, the officers' use of deadly force was objectively reasonable and did not violate White's Fourth Amendment rights.  Thus, the defendants are entitled to qualified immunity, and White is entitled to no relief.

## CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the defendants' motions for summary judgment be granted and that this case be dismissed with prejudice.  It is further

ORDERED that the parties shall file any objections to this Recommendation **on or before June 26, 2013**.  A party must specifically identify the findings in the Recommendation to which objection is made; frivolous, conclusive, or general objections

---

[3] White's claim that he fired at officers only after they fired at him creates no genuine dispute about the reasonableness of the officers' actions or whether their use of force was constitutional.  Even if one of the officers fired first, White's use of a weapon in response shows that he constituted a danger to which officers' further use of deadly force was reasonable under the circumstances of this case.

15

will not be considered.  Failure to file written objections to the Magistrate Judge's proposed findings and recommendations shall bar a party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Lanning Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

Done this 12th day of June, 2013.


_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE